Good morning, everyone. Welcome. Our first case for argument this morning is United States v. Robert Pennington. Ms. Small. Good morning, Your Honors. May it please the Court. Carolyn Small on behalf of the appellant, Mr. Robert Pennington, Jr. During a traffic stop, officers are constrained by the mission of the stop. The Supreme Court made that clear in Rodriguez, where it said that in the absence of reasonable suspicion of other criminal activity, officers cannot prolong the stop. In this case, the officers had a hunch that Mr. Pennington was up to something, and they ultimately detained him for a combined 45 minutes for two minor traffic violations. They knew that they had no probable cause to search the car. They knew that they had no reasonable suspicion to delay the stop beyond issuing a warning. And when Mr. Pennington declined their request to search the car, instead of respecting his Fourth Amendment rights and complying with Rodriguez, they actively coordinated in an effort to find a way around those constitutional constraints. First, Sergeant Fleck initiated a stop and spent 25 minutes detaining Mr. Pennington for a speeding violation. As you know, this is a very fact-intensive process, and so are we agreeing that there was a reasonable suspicion for the stop by Master Sergeant Fleck? Yes, the first stop for speeding, and we are also not challenging the initial basis for the second stop that Sergeant Lillard made. Okay, and so when we—I don't want to try to truncate—where within the stop do we get traction that it's unreasonably delayed or prolonged? So if we look at the second—I'll start with the second stop, because that's the stop where the evidence was discovered. That stop is unreasonably delayed almost immediately, because Sergeant Lillard starts running records checks that he knew Sergeant Fleck had just run within the hour, so he's running redundant records checks for information that he already knew. He already knew the license was valid. He knew registration and insurance were in order. He knew no wants and warrants. So while those types of checks in an ordinary case might be warranted, here those were unreasonable basically from the start. And Sergeant Lillard testified during the suppression hearing that he had all of the information that he needed to write the warning almost immediately. All he needed was the license, and if I can— And so the lead system check is what we're testing the information he already had, registration. Did he have his name, the driver's name? He did not have the driver's name, so that was the one piece of information that he needed to write the warning. He did need the information that was on the driver's license, but he had run the registration and the license plate before he even made the stop. So then when he stops Mr. Pennington, he's running his background, his criminal history essentially is what he's spending the time doing in that first 13 minutes of the stop, before he even opens his system to try to start writing. But is that also objectively reasonable under the cases, running a criminal history for officer safety? So typically that has been considered reasonable, but this wasn't a typical stop, again because of the first stop that Sergeant Flack had just completed. Sergeant Flack had just run that exact check, and it took a long time. When Sergeant Flack did it, he said Kentucky's running slow, and that initially, him running the criminal history check, took a long time. And then he relayed to Sergeant Lillard that his criminal history said that they were trafficking for cocaine and for marijuana. So Sergeant Lillard already knew that, and he's pulled Mr. Pennington over for an improper lane change. And Sergeant Lillard testified that he knew that there were no wants and warrants. So the officer safety component here is different than in a typical traffic stop, where officers are pulling somebody over, they don't know much about the car, they don't know who's in the car, they don't know that person's background. Sergeant Lillard is on different footing than a typical officer in a typical stop, because he already has so much information that has been relayed from Sergeant Flack. So our position is that this stop was delayed almost immediately. But I think another very clear moment of delay here in the second stop is when Sergeant Lillard finally gets through these redundant records checks, he gets through the password issues to open up the warning system, he is ready, he's done everything he needs now to write the warning. And instead of doing that, writing the warning, he calls in another officer. He calls in Trooper Dorsey, who's not right on the scene. He's about 75 yards behind Sergeant Lillard. He has to drive up, and the only reason for that was to conduct a dog sniff. There was no mission-related reason why in that moment Sergeant Lillard couldn't just write the warning. Do we know when Officer Dorsey arrived at that location that is just some yards behind the stop of Pennington's car? I don't think it's clear exactly at what point he arrived. Sergeant Lillard was keeping him in the loop and said, I found him. I don't know exactly when he arrived, but he was parked 75 yards behind him at the time that Sergeant Lillard called him to the scene. Okay. And am I remembering correctly that Sergeant Lillard had been in touch with Officer Dorsey even before the stop occurred? That's right, yes. He'd been keeping him, you know, telling him northbound, I got him, so he'd been keeping him apprised. One of the things that's a little unusual about this case is usually we see stops where the stopping officer is waiting for somebody to bring a dog, and stalling or slow walking things, those are the fact patterns or accusations. Here, Lillard couldn't do both, even though he already had the dog, right? That's right, and he clearly was familiar with Rodriguez, that he said, by the time Trooper Dorsey arrived, he told Mr. Pennington, when Mr. Pennington said, why would you do a dog sniff, he said, because I can, and I'm not delaying the stop. So he clearly was familiar with this issue. Right, so what do we do? We've got, it looks to me from the District Court's transcript like we've got a factual finding that seems pretty close to saying no delay in the second stop. What should we do with that, and on what basis? So, first, the District Court really didn't address the redundant records check issue. And with respect to the delay in this handoff that happens between Sergeant Lillard and Trooper Dorsey, the District Court does say, I find that that didn't delay the stop in any way. I think there's two ways to read that. One is that it was a legal determination that it didn't unreasonably prolong the stop for Trooper Dorsey to come in and do the warning. That wasn't unreasonable, because it was a de minimis delay. And the court used the word de minimis multiple times and acknowledged, you know, even if it was a 30-second to one-minute delay, I find that to be de minimis and not unreasonable. So it's, I think one way to look at the District Court's holding is as a legal conclusion that this court can review de novo. And to the extent that that was a factual finding, I think even the District Court acknowledged there was some delay. The court said it was 30 seconds to a minute. If you look at the video and you line up the timestamps, you can see that it's really more like a two- to three-minute delay. So I think the District Court's decision, whether it was a factual finding or a legal conclusion, is either clearly erroneous as a factual matter and legally erroneous to the extent that it was a legal determination that this was not unreasonable. Can I take you back to the first stop by Sergeant Flack? Suppose, at least as I understand that, I didn't see any problem with that stop up to the point that the warning is issued. And, I mean, yes, the records check was slow, but I don't know there's much traction for you there. But we then have the questioning that continued for about four or five minutes after the warning, the documents were delivered. At that point, Pennington was still in the police car, correct? Correct. If we find that he was still in custody or that he was still being detained at that point, how would that extra four or five minutes have caused or contributed to either the second stop or any unreasonable delay in that second stop? So those four to five minutes is when Sergeant Flack is asking, he asks a number of questions clearly related to a drug investigation. He asks Mr. Pennington for consent to search the car in this period where he's unreasonably prolonging the stop. And Mr. Pennington says no. He denies consent, which he's entitled to do. And as a direct result of that, Sergeant Flack sends out messages to other officers saying, he says, crap, I just got denied. And he testified that that means I just got denied consent to search. And so as a direct result of he unreasonably prolongs the stop to ask for consent, then he uses the denial of the consent to inform other officers to look for Mr. Pennington. And basically asks them to try to find a reason to stop Mr. Pennington, which Sergeant Lillard does. And Sergeant Lillard testified. It's a bit unusual. He testified, and there are messages, contemporaneous messages that he sends, that he was only out there looking for Mr. Pennington because he only stopped Mr. Pennington because he was out there looking for him. He says, I would have stopped two to three other people by now had I not been waiting to stop Mr. Pennington. So all of this is directly flowing from that unreasonably delayed portion of the first stop where he's denying consent. The officer is now looking for him only because of that. And then he finds him, and now we have this whole series of events as a result. And he conducts this dog sniff, which couldn't have happened if he didn't do this handoff to Trooper Dorsey. But how do we, kind of moving back to the first stop, the government maintains that once the documents were handed back to Mr. Pennington, that that converted that moment into this consensual encounter. How would you respond? That is, I think, factually, it's just not consistent with the facts. I mean, somebody, for it to be a consensual encounter, somebody would have to feel free to leave. And where courts, even where an officer hands somebody back their documents and has said, can I ask you more questions? Depending on the circumstances, courts sometimes still find that that's not consensual, although that moves the needle closer to a consensual encounter. If an officer at least asks, can I ask you questions? That didn't happen here. Sergeant Fleck never said, can I ask you more questions? He has required Mr. Pennington to be in the patrol car, where Mr. Pennington had said, you know, I don't want to leave my own car, but he was in the patrol car. He does hand him back his documents, but he never says, you're free to leave. He never says, can I ask you more questions? It's an accusatory tone. He's asking him, are you on probation or parole? Am I going to find anything illegal in the car? So, I mean, there's nothing about this encounter that changes it into a consensual encounter. What do we do then if we take it? I want to move quickly to the Ninth Circuit case that you cited quite a bit as far as once this has moved to true proletariat stop. And how does the taint from, let's say there was a taint that once we asked, can I search your vehicle that four to five minutes? How was there not, and I'm particularly focused on the attenuation of what happened to deliberate Lillard, that those intervening circumstances kind of separates the taint, even if we accept that the first stop tainted the second. So, I know that there was, you know, there was the initial, Sergeant Lillard seized the traffic violation. And that was, that fact is present in Gorman as well. So, there was a traffic infraction there too. And the court in Gorman, which I think is persuasive and should apply here, said that this is all flowing again from that unreasonably prolonged stop. There would never have been a stop. There would never have been a dog sniff. And I think those same factors are present here. There would, Sergeant Lillard's stop would never have come about. I think you could even say, even if, I mean, clearly if Mr. Pennington had consented to the search, things would have been different. But he didn't consent to the search. And everything flows from that. I'm sorry. I just want to double back on what you just said. If he had consented to the search, there's no problem. No. There would have been a problem. The whole analysis would have been different. Okay. I thought you might want to amend that. No. I just think the whole fact pattern changes at that point. If, you know, if he had consented to the search, obviously there would have probably been a search. There probably would have been no second stop. But I think that would have been tainted by the hundreds of April loans and stuff. Well, let me follow up on that. Because if he had consented to the search, because, I mean, right after Officer Flack gives him back his documents, ordinarily that means we're done. You're free to go. And then he asked for consent to search. Mr. Pennington says no. And he said, I'm not going to violate your rights or anything, but I've got some concerns here. And then continues the conversation with, you know, the four minutes or whatever it was of additional questions. If he had given consent to search, that initial question, asking for consent to search, would not have prolonged the stop. So he was free to leave at that point? No. I mean, I think if he had consented, our argument would be that that was tainted by the fact that the stop was unreasonably prolonged. By the one question? No. Because that's where I'm trying to pin this down. At what point was the stop unreasonably extended? So the first stop, everything after the warning was issued. So that wasn't a consent. So even the request for consent to search was a Fourth Amendment violation in your view? In this case, because it came after the point at which the warning had already been issued. Well, that happens a lot of times. In Wisconsin, that's called a badger stop. They always ask after they give the warning, they say, by the way, do you have anything in the car that you shouldn't have? And that's been approved as not a violation of the Fourth Amendment. Now, that may be right or wrong, but I want to pin down what the position is. If everything after the documents are returned is a Fourth Amendment violation, even the first question, which occurs in the first 30 seconds, we need a justification for that position. So I think Rodriguez is clear that once the warning has been issued, the mission of the stop has ended. So here I have to go back and see the exact order. I'd have to go back and check. I don't think the consent was necessarily the very first question. I mean, he asks him a number of questions for several minutes. And so, sure, if someone's going to leave and they're sort of leaving at the same time, someone says, hey, can I ask you a few more questions? That's a different fact pattern. But here we've got an officer who continues to ask, again, not just for consent, he asks about his role status, does the car, is this your car? And he's continuing to interrogate him after the mission has ended. And I want to answer as many questions as you have. I do see my time's up. I'd like to follow up on this a little bit, though, because it's a – obviously we're talking about daily practices by many, many police officers. And maybe I'm out of touch on this, but I thought most of the case law involving this idea, here's your license and here's the warning, most of that case law, as I understand it, involves drivers who are still in their own cars. Yes. And that's why I asked you earlier about the fact that Pennington was in the police car when this happens. And I will want to ask counsel for the government about this, but I'm not sure I would feel at all comfortable just opening up the door of the police car and walking away without the officer explicitly telling me you're free to go now. And so that – I don't know how broadly you need to cling to the idea that one question after delivery of documents is a violation of the Fourth Amendment. Right. And I don't think the court needs to go that far here, given the facts of this case. Well, it's an important question, though, because officers in the field need bright-line rules about what they can and cannot do. And that's why I asked the question, to try to situate this within actual police practice for Fourth Amendment rules that courts hand down. And obviously everything in the Fourth Amendment domain is fact-specific, but where possible we try to be clear about what's permissible and what's impermissible. So we need to know what exactly the rule that you're proposing is. So I think, again, the rule under Rodriguez is clear that once the warning is issued, there should be no further questioning of somebody who is detained. Again, I mean, if there are facts showing that they have been released, they're in their own car, they have their documents back, and it turns into a consensual encounter, officers can follow up with additional questioning. Well, it's always a detention, even if the driver is in his own car. And sometimes the driver is outside the car and they do the whole encounter outside the car. Sometimes the driver is in the squad car. Variations in the fact pattern, but it's all a detention. So your point about it depends on whether there was a detention. It's all a detention until it's not. And so what is that line, I guess, for lack of a better way to describe it, so that we can be clear about what we're saying is a constitutional violation if we side for you? Yeah, and so I think in the cases where courts have said it converted to a consensual encounter, there were facts like the driver was in his own car, he got his documents back, the officer said, you know, you're free to leave, but can I ask you a few more questions? Facts like that. So, I mean, in terms of a bright line rule, again, I think the most bright line of a rule that can be drawn here is Rodriguez's rule, which is that once the warning is issued, the mission for the stop has ended, and it shouldn't be prolonged to investigate other activity. And I think here there was a clear violation of that rule in the first stop. But I do also want to be clear that the court can also hold that the second stop was independently unreasonably prolonged and doesn't have to reach the issues with respect to the first stop. Thank you. I know I'm out of time. I'll give you extra time. Mr. Kinstra. Good morning. May it please the Court. Good morning, Your Honors. Jeff Kinstra on behalf of the United States. The district court correctly rejected the various motions to suppress the evidence here. The second stop by Trooper Willard that gave rise to the discovery of evidence was valid at its outset and probable cause to conduct the search develops during the lawful duration of that search. The earlier stop by Trooper Fleck was likewise reasonable in duration, and regardless, even if there were an alleged delay at the end of that stop, it would not have justified suppressing evidence discovered during the later stop by Trooper Willard, as the district court found. Is the government conceding then that Master Sergeant Fleck asked for consent to search after the first traffic stop was completed? Well, so we do argue that once he handed the documents back, at that point, the interaction became consensual. Okay. And so that is certainly one ground in which this court would have held the case. And how was Mr. Pennington supposed to know that he was free to go? As courts have recognized, the act of handing the documents back, handing the warning back, conveys to the individual that the business of the traffic stop is done. To Your Honor's question about the officer saying something about you're free to leave or something like that, the officer never said anything like that during this encounter.  The defendant got out of the car anyway. So even after the officer asked these questions. Right. But how is a civilian supposed to know when he is free to leave a police car? So that's a reasonable person standard based on the facts presented. And the courts have recognized that, again, typically handing documents back conveys that the stop is over, but that's not dispositive. There are other factors. Say, in one of this court's cases, the documents were returned, but the officer said at the same time, there's a dog on the way, which conveyed pretty clearly to the individual that he needed to remain on the scene. There is no countervailing circumstance of that sort here. Why not just adopt a bright line rule that says when you're stopped by the police, you are detained until the officer says you are free to go? Essentially because that wouldn't be consistent with the Supreme Court's precedent that it's an objective person standard. So that sort of magic words requirement wouldn't be consistent with Supreme Court precedent. Well, this seems like having to read tea leaves for a civilian. Call it magic words, call it what you like, but we all know how fraught civilian police encounters and detentions and traffic stops can be. And so really the question is whether the individual would have been free at that point to decline further questioning and terminate the encounter. And open up the door and walk away, right? Right. And the officer had conveyed to him under the premise that he had handed the documents back handed all of his documents, handed the warning, that the officer's business was done. Then why can't he just say that? I mean, frankly, what you're describing seems wildly unrealistic to me. Well, I mean, what I'm describing is what the case law says. So I'm not making this up. It is an objective person standard. I know you're not making this up, but I'm not sure how closely tied a lot of appellate courts are to realities of those encounters. Well, I think that also just recognizes how people interact. People, when they're having a face-to-face encounter, they have those cues. They understand. They can have a cue. There can be nonverbal cues. I get that. But that's pretty tough to tell for a reviewing court from a video. And that's fair as well. Now, even assuming that at that point of the encounter that the stop continued in progress, based on that assumption, the stop was not done because the defendant was still... You mean the search? I'm sorry? You said the stop was not done? Yeah, that's correct. The purpose of the stop and the stop itself was not done on that assumption because at least one step would have remained at that point, meaning allowing the defendant to return to his car, which of course I've recognized is a perilous point in an encounter for an officer. That's the reason that officers can remove individuals from their cars during a traffic stop, because they could have weapons in the car. In Michigan v. Long, other decisions of this court, courts have recognized that there is a risk to the officer when an individual will be allowed to return to their car. And so the safety concern of the stop, which is a paramount concern at every point of every interaction, still remained in full force. And so even assuming that this was still a stop, the officer was justified based on the truly bizarre and extreme circumstances that were facing him by the defendant at that point to make a reasonable inquiry. Bizarre and extreme? What were the bizarre circumstances other than him being nervous? It was the defendant's extreme nervousness, not just nervousness. So the officer testified that the defendant was overly nervous at the outset, and then that progressed and escalated. And he explained, I'm overly nervous because it's my understanding that police kill black people. That's what the defendant claimed. And the officer, of course, has over a decade of experience and testified, this is the most extreme situation he had seen during his career. And so when faced with a situation where, obviously, the source of his nervousness was not traffic-related, the officer was cordial throughout, so whatever was in that car the officer had good reason to believe was having a profound effect on the defendant's behavior. It was causing a profound reaction by the defendant as he was sitting there. And so before allowing the defendant to return to his car, where that reaction could have produced unpredictable results, the defendant could have regained access to anything in the car, it's reasonable for the officer to have made the very limited inquiries that he made here. He asked four questions after the warning printed that took about two and a half minutes. The questions were, you're pretty nervous, are you sure there's nothing in your car? With your nervousness, do you mind if I take a look through your car? And the defendant declined, denied that anything was in his car, declined consent, and then went on his way. So none of that portion of the stop that the defendant is objecting to produced any new information. And that makes us a very different situation from Gorman, for example, where the stop detoured early on, the officer conducted irrelevant records checks about the defendant's residence. Those irrelevant checks produced entirely new information that the officers would not have otherwise had. Based on that new information, the officer then spent an additional ten minutes questioning the defendant, obtaining further information, including that there was $2,000 at least inside the vehicle. The officer then conveyed all of that information to a second officer, along with an affirmative request that he conduct a stop. None of that is true here. The three or four questions that the officer asked at the end produced no new information at all. And the trooper's delayed stop an hour later was not motivated in any way or affected in any way by this objective question. And I guess that's really the question where we have to get to is, looking at that Ninth Circuit case, is the taint occurring after the written warning is issued? Is that what Mr. Pennington is suggesting? Is that the suspicion of Trooper Flack wasn't raised until Pennington refused to allow him to search? Or does the suspicion reach back while Trooper Flack is still preparing, Master Sergeant, I'm sorry, Flack was still preparing the written warning? Right. And so I think that is what the defendant's arguing. But as the record makes clear, and as the officer testified, his suspicions at that point and the defendant's... At which point? At the point that the warning had printed, and this is on page 12 of the transcript, he says that the defendant's, quote, extreme nervousness was the reason he asked those follow-up questions. And, in fact, he prefaced each of his questions with references to the defendant's nervousness. He said, you're pretty nervous. Do you mind if I take a look through your car? With your nervousness, or you're pretty nervous, are you sure there's nothing in there? With your nervousness, do you mind if I take a look through the car? When the defendant declined consent, his response was, well, I'm not going to violate your rights or anything. If you don't want me to search, I'm not going to search. But I believe you're up to something. You're pretty darn nervous. So the suspicions and the defendant's nervousness preexisted this portion of the stop that the defendant is challenging. On top of that, the stop by Lillard took place over an hour later. During that time, the defendant was entirely at liberty. He was not under police surveillance. He could have stopped and disposed of the drugs if he wanted to. Mr. Kainstrom, suppose, well, let's take this a step at a time. Under Rodriguez, is an officer allowed to run through all the records checks twice in an ordinary traffic stop? That wouldn't be routine for the same officer. You'd have to have a good reason to do it, right? Right. And this part is recognized, for example, with frisks.  Frisks are different, but we're talking about records. I understand an officer doesn't have to depend on his colleague's frisk of a suspect. But with respect to records checks, then suppose it's two stops by the same officer an hour apart. Is the officer entitled to do the same checks all over again for license, registration, criminal history, and so on? I think in that circumstance, it's a similar analysis. Because the officer actually has that information himself. He's done it. He's confirmed it. And importantly, the criminal history is very important. Because the criminal history is for the officer's safety. And that's where it becomes so important here that it was a separate officer at the second stop. Is there any doubt, though, that Lillard was briefed by Flack about this driver's criminal history? Yes. As your honors have already recognized, Flack didn't even provide the name of the individual he had interacted with. He didn't say whether there were multiple individuals in the car. So Pennington didn't know who this individual was. He couldn't be sure it was the same person. You mean Lillard, not Pennington. I'm sorry. Thank you, your honor. That's correct. Lillard. Now, so for that reason, it's reasonable for him to obtain the individual's driver's license and to confirm its validity. As to the criminal history, the only information that Flack had provided was very general information concerning only the suspicions of drug dealing or drug possession. He said the person has a history of trafficking cocaine and weed. He didn't say any details about those matters. He didn't say whether there were arrests or convictions. He didn't say when or where they occurred. On top of that, he didn't say or purport to say anything at all about whether the defendant had a history of violence or a gang affiliation. And, in fact, the defendant did have a prior battery conviction, at least two convictions for resisting police, and a prior gang affiliation. Those are all matters that are relevant to an officer to protect their own safety. Those are also matters that weren't conveyed to Lillard. And so for the very same reason that Flack, during the first stop, was entitled to ask the dispatcher to continue providing information about the defendant's criminal history, so was Lillard entitled to obtain that same information for himself for the same reason, so that each officer could protect their own safety. Any reason to double-check registration and insurance? The officer, in fact, did those things before the stop occurred.  Because he had the license plate. And so he didn't have to do those things after the stop. He didn't have to re-duplicate those taxes. But he didn't know the license was valid. He didn't know the defendant's criminal history. And so he was entitled to run those checks for himself under these conditions. So that's a separate officer. Does the record here suggest any reason to have officer Dorsey issue the warning other than to free Lillard to do the dog sniff? So the record doesn't say exactly why. The subjective reason, I suspect, was the dog sniff. I'm asking for the record. I suspect so too. Okay. I don't see any other reason. I'm asking you, is there any other reason suggested by the record? No. Okay. Thank you. But to that issue, it's common ground, I take it, that the canine sniff itself had no effect on the stop's length. While Lillard was running the dog, Dorsey was in the car working on the warning. So what the defendant is objecting to then is really the officer's allocation of tasks at the earlier point of the stop where they switched places. And there's really no requirement under the Fourth Amendment that officers take the fastest possible course, that they act in the most expeditious possible manner. They only have to act reasonably. And for that reason, courts don't second guess their logistical decisions or the allocation of tasks as this court's case law reflects. Here, there was a task that remained to be completed, namely, the warning had to be written. There were two officers on the scene. One of them had to do it. And that's exactly what happened. Lillard asked Dorsey to write the warning. He took a spot and commenced writing the warning. And that didn't create, in fact, in the district court's findings, that caused no delay on the stop. But even if there were a de minimis delay, the de minimis length means that it's a reasonable one. When did Trooper Dorsey arrive at the stop? Do we know? We don't have a timestamp, but the testimony from both Dorsey and Lillard is that it was within a few minutes of when the stop occurred. He had alerted Dorsey even before he saw the defendant that he was going to be looking for him. Once he saw the defendant pass him, he sent Dorsey a message. And so Dorsey then responded to the scenes and was on site within a matter of minutes. He was also there minutes before, at least he was asked to take the place of Officer Lillard. So as your honors have recognized, this wasn't a sort of situation where the officers are delaying in hopes that they'll be able to conduct the canine search. Both the canine, the backup officer were on site at the same time. So it was just a matter of allocating the tasks so that that could occur. I'm happy to answer any, any other questions, but I see my time is out. So we'd ask this court to affirm. Thank you. Thank you. Ms. Small, your time had expired, but I'll give you some extra time and rebuttal. Thank you, your honor. Just briefly, the, the court doesn't have to say, you know, task allocation is not okay or calling backup is not okay. Those are, those are things that officers can do, but they always have to remain reasonable. And here in the context of this stop, given everything that had occurred, the first stop, which lasted 25 minutes, the 13 minutes of redundant records checks the problems with his computer, which the officer that wasn't his fault, but it's still had already delayed the stop. The fact that he would then, instead of just going ahead and writing the warning, but that he would then call in another officer to the scene, spend the time waiting for the officer to arrive, spend the time debriefing him, spend the time switching places with him. That's it was two to three minutes of that. And that was unreasonable under these circumstances, given the facts. And a reasonably diligent officer who wasn't trying to conduct a dog sniff would have just written a warning. That I think is a key point in this case is that, and a key moment in this case is that handoff is really, I think one of the clearest examples of why the stop was unreasonably prolonged and just, I'll just end by saying pre pretextual stops are clearly okay under the law. That is something that ran clearly allows, but the Supreme court has also tried to impose meaningful limits by way of stops cannot be prolonged beyond their mission. And when you have a case like this one, where it's clear that there was pretext for the stop, I think courts should be, there's a, there should be a heightened awareness of what the officers are doing. And there is a high risk that the officers are going to prolong the stop. And that is what happened here. Small. Could you comment briefly on the government's argument that officer Lillard was entitled to do a new round of criminal history checks to get the full details? So I think that this, I think the example of two officers on the scene at the same time is helpful here, because I think if you had one officer do a records check, and then you have a second officer say, well, I want to do my own records check because I want to feel comfortable, even though you just told me that everything checked out, I think that would be clear that that is unreasonable. And this case is really no different from that. You have these stops. They're technically two separate stops, but they happen within an hour. You have all of the information relayed. You even have Sergeant Lillard testifying. I had no concern. He, this isn't a situation where the officer testified. I don't trust those records checks. I wanted to do my own records checks. He didn't say any of that. He just said, this is just my process, but that just because it's his process, it doesn't make it reasonable. Thank you. Thank you. Our thanks to all counsel. We'll take the case under advisement.